## UNITED STATES *v.* EICHMAN ET AL.

No. 89–1433.   Argued May 14, 1990—Decided June 11, 1990*

---

*Together with No. 89–1434, *United States* v. *Haggerty et al.*, on appeal from the District Court for the Western District of Washington.

BRENNAN, J., delivered the opinion of the Court, in which MARSHALL, BLACKMUN, SCALIA, and KENNEDY, JJ., joined. STEVENS, J., filed a dissenting opinion, in which REHNQUIST, C. J., and WHITE and O'CONNOR, JJ., joined, *post*, p. 319.

*Solicitor General Starr* argued the cause for the United States. With him on the briefs were *Assistant Attorney General Dennis, Deputy Solicitor General Roberts*, and *Michael R. Lazerwitz.*

*William M. Kunstler* argued the cause for appellees in both cases. With him on the brief in both cases were *Ronald L. Kuby, David D. Cole, Nina Kraut*, and *Kevin Peck. Charles S. Hamilton III*, by appointment of the Court, 495 U. S. 902, filed a brief in No. 89–1434 for appellee Strong.†

———————————

†Briefs of *amici curiae* urging reversal were filed for the United States Senate by *Michael Davidson, Ken U. Benjamin, Jr.*, and *Morgan J. Frankel;* for Senator Joseph R. Biden, Jr., by *Kenneth S. Geller, Andrew*

Justice Brennan delivered the opinion of the Court.

In these consolidated appeals, we consider whether appellees' prosecution for burning a United States flag in violation of the Flag Protection Act of 1989 is consistent with the First Amendment. Applying our recent decision in *Texas* v. *Johnson*, 491 U. S. 397 (1989), the District Courts held that the Act cannot constitutionally be applied to appellees. We affirm.

I

In No. 89–1433, the United States prosecuted certain appellees for violating the Flag Protection Act of 1989, 103 Stat. 777, 18 U. S. C. § 700 (1988 ed. and Supp. I), by knowingly setting fire to several United States flags on the steps of the United States Capitol while protesting various aspects of the Government's domestic and foreign policy. In No. 89–1434, the United States prosecuted other appellees for violating the Act by knowingly setting fire to a United States flag in Seattle while protesting the Act's passage. In each case, the respective appellees moved to dismiss the flag-burning charge on the ground that the Act, both on its face and as applied, violates the First Amendment. Both the

*J. Pincus,* and *Roy T. Englert, Jr.;* for Governor Mario M. Cuomo by *Evan A. Davis;* and for the Southeastern Legal Foundation, Inc., by *Robert L. Barr, Jr.,* and *G. Stephen Parker.*

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Charles Fried, Kathleen M. Sullivan, Norman Dorsen,* and *Steven R. Shapiro;* for the Association of Art Museum Directors et al. by *James C. Goodale;* for the National Association for the Advancement of Colored People by *Charles E. Carter;* for People for the American Way et al. by *Timothy B. Dyk, Glen D. Nager,* and *Elliot M. Mincberg;* and for Jasper Johns et al. by *Robert G. Sugarman* and *Gloria C. Phares.*

Briefs of *amici curiae* were filed for the Speaker and Leadership Group of the United States House of Representatives by *Steven R. Ross, Charles Tiefer, Michael L. Murray, Janina Jaruzelski,* and *Robert Michael Long;* and for the American Bar Association by *Stanley Chauvin, Jr., Randolph W. Thrower,* and *Robert B. McKay.*

United States District Court for the Western District of Washington, 731 F. Supp. 415 (1990), and the United States District Court for the District of Columbia, 731 F. Supp. 1123 (1990), following *Johnson, supra,* held the Act unconstitutional as applied to appellees and dismissed the charges.[1] The United States appealed both decisions directly to this Court pursuant to 18 U. S. C. § 700(d) (1982 ed., Supp. I).[2] We noted probable jurisdiction and consolidated the two cases. 494 U. S. 1063 (1990).

## II

Last Term in *Johnson,* we held that a Texas statute criminalizing the desecration of venerated objects, including the United States flag, was unconstitutional as applied to an individual who had set such a flag on fire during a political demonstration. The Texas statute provided that "[a] person commits an offense if he intentionally or knowingly desecrates . . . [a] national flag," where "desecrate" meant to "deface, damage, or otherwise physically mistreat in a way that the actor knows will seriously offend one or more persons likely to observe or discover his action." Tex. Penal Code Ann. § 42.09 (1989). We first held that Johnson's flag burning was "conduct 'sufficiently imbued with elements of communication' to implicate the First Amendment." 491 U. S., at 406 (citation omitted). We next considered and rejected the State's contention that, under *United States* v. *O'Brien,*

---

[1] The Seattle appellees were also charged with causing willful injury to federal property in violation of 18 U. S. C. §§ 1361 and 1362. This charge remains pending before the District Court, and nothing in today's decision affects the constitutionality of this prosecution. See n. 5, *infra.*

[2] "(1) An appeal may be taken directly to the Supreme Court of the United States from any interlocutory or final judgment, decree, or order issued by a United States district court ruling upon the constitutionality of subsection (a).

"(2) The Supreme Court shall, if it has not previously ruled on the question, accept jurisdiction over the appeal and advance on the docket and expedite to the greatest extent possible." 18 U. S. C. § 700(d) (1988 ed., Supp. I).

391 U. S. 367 (1968), we ought to apply the deferential standard with which we have reviewed Government regulations of conduct containing both speech and nonspeech elements where "the governmental interest is unrelated to the suppression of free expression." *Id.*, at 377. We reasoned that the State's asserted interest "in preserving the flag as a symbol of nationhood and national unity," was an interest "related 'to the suppression of free expression' within the meaning of *O'Brien*" because the State's concern with protecting the flag's symbolic meaning is implicated "only when a person's treatment of the flag communicates some message." *Johnson, supra,* at 410. We therefore subjected the statute to "'the most exacting scrutiny,'" 491 U. S., at 412, quoting *Boos* v. *Barry*, 485 U. S. 312, 321 (1988), and we concluded that the State's asserted interests could not justify the infringement on the demonstrator's First Amendment rights.

After our decision in *Johnson*, Congress passed the Flag Protection Act of 1989.[3] The Act provides in relevant part:

> "(a)(1) Whoever knowingly mutilates, defaces, physically defiles, burns, maintains on the floor or ground, or tramples upon any flag of the United States shall be fined under this title or imprisoned for not more than one year, or both.
>
> "(2) This subsection does not prohibit any conduct consisting of the disposal of a flag when it has become worn or soiled.
>
> "(b) As used in this section, the term 'flag of the United States' means any flag of the United States, or any part thereof, made of any substance, of any size, in a form that is commonly displayed." 18 U. S. C. § 700 (1988 ed., Supp. I).

---

[3] The Act replaced the then-existing federal flag-burning statute, which Congress perceived might be unconstitutional in light of *Johnson.* Former 18 U. S. C. § 700(a) prohibited "knowingly cast[ing] contempt upon any flag of the United States by publicly mutilating, defacing, defiling, burning, or trampling upon it."

The Government concedes in these cases, as it must, that appellees' flag burning constituted expressive conduct, Brief for United States 28; see *Johnson*, 491 U. S., at 405–406, but invites us to reconsider our rejection in *Johnson* of the claim that flag burning as a mode of expression, like obscenity or "fighting words," does not enjoy the full protection of the First Amendment. Cf. *Chaplinsky* v. *New Hampshire*, 315 U. S. 568, 572 (1942). This we decline to do.[4] The only remaining question is whether the Flag Protection Act is sufficiently distinct from the Texas statute that it may constitutionally be applied to proscribe appellees' expressive conduct.

The Government contends that the Flag Protection Act is constitutional because, unlike the statute addressed in *Johnson*, the Act does not target expressive conduct on the basis of the content of its message. The Government asserts an interest in "protect[ing] the physical integrity of the flag under all circumstances" in order to safeguard the flag's identity "'as the unique and unalloyed symbol of the Nation.'" Brief for United States 28, 29. The Act proscribes conduct (other than disposal) that damages or mistreats a flag, without regard to the actor's motive, his intended message, or the likely effects of his conduct on onlookers. By contrast, the Texas statute expressly prohibited only those acts of physical flag desecration "that the actor knows will seriously offend" onlookers, and the former federal statute prohibited only those acts of desecration that "cas[t] contempt upon" the flag.

Although the Flag Protection Act contains no explicit content-based limitation on the scope of prohibited conduct, it is nevertheless clear that the Government's asserted *interest* is "related 'to the suppression of free expression,'" 491 U. S., at 410, and concerned with the content of such expression. The Government's interest in protecting the "physical integ-

---

[4] We deal here with concededly political speech and have no occasion to pass on the validity of laws regulating commercial exploitation of the image of the United States flag. See *Texas* v. *Johnson*, 491 U. S. 397, 415–416, n. 10 (1989); cf. *Halter* v. *Nebraska*, 205 U. S. 34 (1907).

rity" of a privately owned flag[5] rests upon a perceived need to preserve the flag's status as a symbol of our Nation and certain national ideals. But the mere destruction or disfigurement of a particular physical manifestation of the symbol, without more, does not diminish or otherwise affect the symbol itself in any way. For example, the secret destruction of a flag in one's own basement would not threaten the flag's recognized meaning. Rather, the Government's desire to preserve the flag as a symbol for certain national ideals is implicated "only when a person's treatment of the flag communicates [a] message" to others that is inconsistent with those ideals.[6] *Ibid.*

[5] Today's decision does not affect the extent to which the Government's interest in protecting publicly owned flags might justify special measures on their behalf. See *Spence* v. *Washington*, 418 U. S. 405, 408–409 (1974); cf. *Johnson, supra*, at 412–413, n. 8.

[6] Aside from the flag's association with particular ideals, at some irreducible level the flag is emblematic of the Nation as a sovereign entity. The Government's *amici* assert that it has a legitimate nonspeech-related interest in safeguarding this "eminently practical legal aspect of the flag, as an incident of sovereignty." Brief for the Speaker and Leadership Group of the U. S. House of Representatives as *Amici Curiae* 25. This interest has firm historical roots: "While the symbolic role of the flag is now well-established, the flag was an important incident of sovereignty before it was used for symbolic purposes by patriots and others. When the nation's founders first determined to adopt a national flag, they intended to serve specific functions relating to our status as a sovereign nation." *Id.*, at 9; see *id.*, at 5 (noting "flag's 'historic function' for such sovereign purposes as marking 'our national presence in schools, public buildings, battleships and airplanes' ") (citation omitted).

We concede that the Government has a legitimate interest in preserving the flag's function as an "incident of sovereignty," though we need not address today the extent to which this interest may justify any laws regulating conduct that would thwart this core function, as might a commercial or like appropriation of the image of the United States flag. *Amici* do not, and cannot, explain how a statute that penalizes anyone who knowingly burns, mutilates, or defiles any American flag is designed to advance this asserted interest in maintaining the association between the flag and the Nation. Burning a flag does not threaten to interfere with this association

Moreover, the precise language of the Act's prohibitions confirms Congress' interest in the communicative impact of flag destruction. The Act criminalizes the conduct of anyone who "knowingly mutilates, defaces, physically defiles, burns, maintains on the floor or ground, or tramples upon any flag." 18 U. S. C. § 700(a)(1) (1988 ed., Supp. I). Each of the specified terms—with the possible exception of "burns"—unmistakably connotes disrespectful treatment of the flag and suggests a focus on those acts likely to damage the flag's symbolic value.[7] And the explicit exemption in § 700(a)(2) for disposal of "worn or soiled" flags protects certain acts traditionally associated with patriotic respect for the flag.[8]

As we explained in *Johnson, supra,* at 416–417: "[I]f we were to hold that a State may forbid flag burning wherever it is likely to endanger the flag's symbolic role, but allow it wherever burning a flag promotes that role—as where, for example, a person ceremoniously burns a dirty flag—we would be . . . permitting a State to 'prescribe what shall be orthodox' by saying that one may burn the flag to convey one's attitude toward it and its referents only if one does not endanger the flag's representation of nationhood and national unity." Although Congress cast the Flag Protection Act of 1989 in somewhat broader terms than the Texas statute at issue in *Johnson,* the Act still suffers from the same fundamental flaw: It suppresses expression out of concern for its likely communicative impact. Despite the Act's wider scope,

---

in any way; indeed, the flag burner's message depends in part on the viewer's ability to make this very association.

[7] For example, "defile" is defined as "to make filthy; to corrupt the purity or perfection of; to rob of chastity; to make ceremonially unclean; tarnish, dishonor." Webster's Third New International Dictionary 592 (1976). "Trample" is defined as "to tread heavily so as to bruise, crush, or injure; to inflict injury or destruction: have a contemptuous or ruthless attitude." *Id.,* at 2425.

[8] The Act also does not prohibit flying a flag in a storm or other conduct that threatens the physical integrity of the flag, albeit in an indirect manner unlikely to communicate disrespect.

its restriction on expression cannot be "'justified without reference to the content of the regulated speech.'" *Boos*, 485 U. S., at 320 (emphasis omitted) (citation omitted); see *Spence* v. *Washington*, 418 U. S. 405, 414, nn. 8, 9 (1974) (State's interest in protecting flag's symbolic value is directly related to suppression of expression and thus *O'Brien* test is inapplicable even where statute declared "simply . . . that *nothing* may be affixed to or superimposed on a United States flag"). The Act therefore must be subjected to "the most exacting scrutiny," *Boos, supra,* at 321, and for the reasons stated in *Johnson,* 491 U. S., at 413–415, the Government's interest cannot justify its infringement on First Amendment rights. We decline the Government's invitation to reassess this conclusion in light of Congress' recent recognition of a purported "national consensus" favoring a prohibition on flag burning. Brief for United States 27. Even assuming such a consensus exists, any suggestion that the Government's interest in suppressing speech becomes more weighty as popular opposition to that speech grows is foreign to the First Amendment.

### III

"'National unity as an end which officials may foster by persuasion and example is not in question.'" *Johnson, supra,* at 418, quoting *West Virginia Board of Education* v. *Barnette,* 319 U. S. 624, 640 (1943). Government may create national symbols, promote them, and encourage their respectful treatment.[9] But the Flag Protection Act of 1989 goes well beyond this by criminally proscribing expressive conduct because of its likely communicative impact.

We are aware that desecration of the flag is deeply offensive to many. But the same might be said, for example, of virulent ethnic and religious epithets, see *Terminiello* v. *Chicago,* 337 U. S. 1 (1949), vulgar repudiations of the draft, see

---

[9] See, *e. g.,* 36 U. S. C. §§ 173–177 (suggesting manner in which flag ought to be displayed).

*Cohen* v. *California,* 403 U. S. 15 (1971), and scurrilous caricatures, see *Hustler Magazine, Inc.* v. *Falwell,* 485 U. S. 46 (1988). "If there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Johnson, supra,* at 414. Punishing desecration of the flag dilutes the very freedom that makes this emblem so revered, and worth revering. The judgments of the District Courts are

*Affirmed.*

JUSTICE STEVENS, with whom THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE O'CONNOR join, dissenting.

The Court's opinion ends where proper analysis of the issue should begin. Of course "the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Ante* this page. None of us disagrees with that proposition. But it is equally well settled that certain methods of expression may be prohibited if (a) the prohibition is supported by a legitimate societal interest that is unrelated to suppression of the ideas the speaker desires to express; (b) the prohibition does not entail any interference with the speaker's freedom to express those ideas by other means; and (c) the interest in allowing the speaker complete freedom of choice among alternative methods of expression is less important than the societal interest supporting the prohibition.

Contrary to the position taken by counsel for the flag burners in *Texas* v. *Johnson,* 491 U. S. 397 (1989), it is now conceded that the Federal Government has a legitimate interest in protecting the symbolic value of the American flag. Obviously that value cannot be measured, or even described, with any precision. It has at least these two components: In times of national crisis, it inspires and motivates the average citizen to make personal sacrifices in order to achieve societal goals of overriding importance; at all times, it serves as a re-

minder of the paramount importance of pursuing the ideals that characterize our society.

The first question the Court should consider is whether the interest in preserving the value of that symbol is unrelated to suppression of the ideas that flag burners are trying to express. In my judgment the answer depends, at least in part, on what those ideas are. A flag burner might intend various messages. The flag burner may wish simply to convey hatred, contempt, or sheer opposition directed at the United States. This might be the case if the flag were burned by an enemy during time of war. A flag burner may also, or instead, seek to convey the depth of his personal conviction about some issue, by willingly provoking the use of force against himself. In so doing, he says that "my disagreement with certain policies is so strong that I am prepared to risk physical harm (and perhaps imprisonment) in order to call attention to my views." This second possibility apparently describes the expressive conduct of the flag burners in these cases. Like the protesters who dramatized their opposition to our engagement in Vietnam by publicly burning their draft cards—and who were punished for doing so—their expressive conduct is consistent with affection for this country and respect for the ideals that the flag symbolizes. There is at least one further possibility: A flag burner may intend to make an accusation against the integrity of the American people who disagree with him. By burning the embodiment of America's collective commitment to freedom and equality, the flag burner charges that the majority has forsaken that commitment—that continued respect for the flag is nothing more than hypocrisy. Such a charge may be made even if the flag burner loves the country and zealously pursues the ideals that the country claims to honor.

The idea expressed by a particular act of flag burning is necessarily dependent on the temporal and political context in which it occurs. In the 1960's it may have expressed opposition to the country's Vietnam policies, or at least to the

compulsory draft. In *Texas* v. *Johnson*, it apparently expressed opposition to the platform of the Republican Party. In these cases, the appellees have explained that it expressed their opposition to racial discrimination, to the failure to care for the homeless, and of course to statutory prohibitions of flag burning. In any of these examples, the protesters may wish both to say that their own position is the only one faithful to liberty and equality, and to accuse their fellow citizens of hypocritical indifference to—or even of a selfish departure from—the ideals which the flag is supposed to symbolize. The ideas expressed by flag burners are thus various and often ambiguous.

The Government's legitimate interest in preserving the symbolic value of the flag is, however, essentially the same regardless of which of many different ideas may have motivated a particular act of flag burning. As I explained in my dissent in *Johnson*, 491 U. S., at 436–439, the flag uniquely symbolizes the ideas of liberty, equality, and tolerance— ideas that Americans have passionately defended and debated throughout our history. The flag embodies the spirit of our national commitment to those ideals. The message thereby transmitted does not take a stand upon our disagreements, except to say that those disagreements are best regarded as competing interpretations of shared ideals. It does not judge particular policies, except to say that they command respect when they are enlightened by the spirit of liberty and equality. To the world, the flag is our promise that we will continue to strive for these ideals. To us, the flag is a reminder both that the struggle for liberty and equality is unceasing, and that our obligation of tolerance and respect for all of our fellow citizens encompasses those who disagree with us—indeed, even those whose ideas are disagreeable or offensive.

Thus, the Government may—indeed, it should—protect the symbolic value of the flag without regard to the specific content of the flag burners' speech. The prosecution in these

cases does not depend upon the object of the defendants' protest. It is, moreover, equally clear that the prohibition does not entail any interference with the speaker's freedom to express his or her ideas by other means. It may well be true that other means of expression may be less effective in drawing attention to those ideas, but that is not itself a sufficient reason for immunizing flag burning. Presumably a gigantic fireworks display or a parade of nude models in a public park might draw even more attention to a controversial message, but such methods of expression are nevertheless subject to regulation.

These cases therefore come down to a question of judgment. Does the admittedly important interest in allowing every speaker to choose the method of expressing his or her ideas that he or she deems most effective and appropriate outweigh the societal interest in preserving the symbolic value of the flag? This question, in turn, involves three different judgments: (1) The importance of the individual interest in selecting the preferred means of communication; (2) the importance of the national symbol; and (3) the question whether tolerance of flag burning will enhance or tarnish that value. The opinions in *Texas* v. *Johnson* demonstrate that reasonable judges may differ with respect to each of these judgments.

The individual interest is unquestionably a matter of great importance. Indeed, it is one of the critical components of the idea of liberty that the flag itself is intended to symbolize. Moreover, it is buttressed by the societal interest in being alerted to the need for thoughtful response to voices that might otherwise go unheard. The freedom of expression protected by the First Amendment embraces not only the freedom to communicate particular ideas, but also the right to communicate them effectively. That right, however, is not absolute—the communicative value of a well-placed bomb in the Capitol does not entitle it to the protection of the First Amendment.

Burning a flag is not, of course, equivalent to burning a public building. Assuming that the protester is burning his own flag, it causes no physical harm to other persons or to their property. The impact is purely symbolic, and it is apparent that some thoughtful persons believe that impact, far from depreciating the value of the symbol, will actually enhance its meaning. I most respectfully disagree. Indeed, what makes these cases particularly difficult for me is what I regard as the damage to the symbol that has already occurred as a result of this Court's decision to place its stamp of approval on the act of flag burning. A formerly dramatic expression of protest is now rather commonplace. In today's marketplace of ideas, the public burning of a Vietnam draft card is probably less provocative than lighting a cigarette. Tomorrow flag burning may produce a similar reaction. There is surely a direct relationship between the communicative value of the act of flag burning and the symbolic value of the object being burned.

The symbolic value of the American flag is not the same today as it was yesterday. Events during the last three decades have altered the country's image in the eyes of numerous Americans, and some now have difficulty understanding the message that the flag conveyed to their parents and grandparents—whether born abroad and naturalized or native born. Moreover, the integrity of the symbol has been compromised by those leaders who seem to advocate compulsory worship of the flag even by individuals whom it offends, or who seem to manipulate the symbol of national purpose into a pretext for partisan disputes about meaner ends. And, as I have suggested, the residual value of the symbol after this Court's decision in *Texas* v. *Johnson* is surely not the same as it was a year ago.

Given all these considerations, plus the fact that the Court today is really doing nothing more than reconfirming what it has already decided, it might be appropriate to defer to the judgment of the majority and merely apply the doctrine of

*stare decisis* to the cases at hand. That action, however, would not honestly reflect my considered judgment concerning the relative importance of the conflicting interests that are at stake. I remain persuaded that the considerations identified in my opinion in *Texas* v. *Johnson* are of controlling importance in these cases as well.

Accordingly, I respectfully dissent.